Kerrie DALLMAN; Laurence Botnick; School District 14 Classroom Teachers Association Political Action Committee, a Colorado political committee; School District 14 Classroom Teachers Association, a Colorado labor organization; and Aurora Fire Fighters Protective Association, a Colorado labor organization; Douglas County Federation, a Colorado labor organization, Plaintiffs–Appellees

v.

William RITTER, in his official capacity as the Governor of Colorado; and Rich L. Gonzales, in his official capacity as the Executive Director of Colorado's Department of Personnel and Administration, Defendants–Appellants.

Daniel Ritchie, an individual; Patrick Hamill, an individual; Charles V. Brown, Jr., an individual; Matthew R. Dalton, an individual; The Children's Hospital Association, a 501(c)(3) nonprofit organization; and The Colorado Seminary, a 501(c)(3) nonprofit which owns and operates the University of Denver, Plaintiffs–Appellees

v.

Bill Ritter, as Governor of the State of Colorado; and Rich Gonzales, as Executive Director of the Colorado Department of Administration, Defendants–Appellants.

No. 09SA224.

Supreme Court of Colorado,
En Banc.

Feb. 22, 2010.

Isaacson Rosenbaum, P.C., Mark G. Grueskin, Edward T. Ramey, Denver, Colorado, Attorneys for Plaintiffs–Appellees Kerrie Dallman and Laurence Botnick.

Colorado Education Association, Martha R. Houser, Bradley C. Bartels, Denver, Colorado, Attorneys for Plaintiffs–Appellees School District 14 Classroom Teachers Association Political Action Committee, a Colorado political committee; and School District 14 Classroom Teachers Association, a Colorado labor organization.

Buescher Goldhammer Kelman & Dodge, P.C., Thomas B. Buescher, Joseph M. Goldhammer, Denver, Colorado, Attorneys for Plaintiff–Appellees Aurora Fire Fighters Protective Association, a Colorado labor organization; and Douglas County Federation, a Colorado labor organization.

The Dubofsky Law Firm, P.C., Jean E. Dubofsky, Boulder, Colorado, Greenberg Traurig, LLP, Michael R. Davis, Douglas J. Friednash, Denver, Colorado, Attorneys for Plaintiffs–Appellees Daniel Ritchie, Patrick Hamill, Charles V. Brown, Jr., and Matthew R. Dalton, as individuals; The Children's Hospital Association, a 501(c)(3) nonprofit organization; and The Colorado Seminary, a 501(c)(3) nonprofit which owns and operates the University of Denver.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, Denver, Colorado, Attorneys for Defendant–Appellee.

Cross & Liechty, P.C., Robert M. Liechty, Greenwood Village, Colorado, Attorneys for Amicus Curiae Clean Government Colorado.

Justice RICE delivers the Opinion of the Court.

Plaintiffs-appellees challenge the constitutionality of Amendment 54, now codified as parts of article XXVIII of the Colorado Constitution. Voters narrowly passed Amendment 54 in November 2008, and it became operational on December 31st of that year. Colo. Const. art XXVIII, § 13. Designed to eliminate "a presumption of impropriety between contributions to any campaign and sole source government contracts," the Amendment prohibits and imposes severe penalties on campaign donations from those holding sole source contracts to "any candidate for any elected office of the state or any of its political subdivisions." Colo. Const. art XXVIII, § 15.

The plaintiffs allege a multitude of constitutional inadequacies that, in total, would render all of Amendment 54 invalid. The plaintiffs range from unions impacted by the Amendment to the Children's Hospital to the chief officer of the Denver Center for the Performing Arts. Although some of the plaintiffs' arguments are meritless, we agree that many of Amendment 54's component parts are unconstitutionally vague, disproportional, overbroad, or otherwise infirm. Indeed, we find the Amendment's deficiencies so pervasive that we must nullify the Amendment in its entirety, leaving article XXVIII of the Colorado Constitution as it was prior to November 2008.

## I. Facts and Procedural History

### A. Overview of Amendment 54

We begin by outlining Amendment 54's additions to the Campaign and Political Finance Article of the Colorado Constitution. Section 15 includes both the stated purpose of the Amendment and its principal rule—a complete prohibition of all contributions by contract holders and contributions made on behalf of contract holders and their immediate family, during the contract and for two years thereafter, to any candidate for any office or any political party. Colo. Const. art. XXVIII, § 15. In its entirety, this key provision reads:

Because of a presumption of impropriety between contributions to any campaign and sole source government contracts, contract holders shall contractually agree, for the duration of the contract and for two years thereafter, to cease making, causing to be made, or inducing by any means, a contribution, directly or indirectly, on be-

half of the contract holder or on behalf of his or her immediate family member and for the benefit of any political party or for the benefit of any candidate for any elected office of the state or any of its political subdivisions.

*Id.* The drafters' language combines into a single sentence the Amendment's purpose, duration, and ban on contributions, with language describing its application to various political actors, contract holders, and contract holders' families.

By comparison, section 16 is more limited. It describes a publication mechanism designed to inform the public of all sole source government contracts and their contents.[1] First, it instructs the executive director of the department of personnel to "publish and maintain a summary of each sole source government contract issued." Colo. Const. art. XXVIII, § 16. Next, it requires all holders of sole source contracts to provide the executive director of the department of personnel a "Government Contract Summary," including the names and addresses of all contracting parties, the nature of the contract, the estimated contract amount, the dates of the contract period, and a disclosure of "other information as determined by the executive director of the department of personnel." *Id.* Finally, it empowers the executive director to promulgate rules to facilitate enforcement of these requirements. *Id.*

Section 17 is better understood as an amalgamation of five relatively unrelated subsections than as a single, cohesive constitutional provision. Subsection 1 begins by incorporating section 15 into all future government contracts. Colo. Const. art. XXVIII, § 17(1). It then turns to penalties, stating that:

---

1. In its entirety, section 16 reads:

To aid in enforcement of this measure concerning sole source contracts, the executive director of the department of personnel shall promptly publish and maintain a summary of each sole source government contract issued. Any contract holder of a sole source government contract shall promptly prepare and deliver to the executive director of the department of personnel a true and correct "Government Contract Summary," in digital format as prescribed by that office, which shall identify the names and addresses of the contract holders and all other parties to the

government contract, briefly describe the nature of the contract and goods or services performed, disclose the start and end date of the contract, disclose the contract's estimated amount or rate of payment, disclose the sources of payment, and disclose other information as determined by the executive director of the department of personnel which is not in violation of federal law, trade secrets or intellectual property rights. The executive director of the department of personnel is hereby given authority to promulgate rules to facilitate this section.

Colo. Const. art. XXVIII, § 16.

Any person who intentionally accepts contributions on behalf of a candidate committee, political committee, small donor committee, political party, or other entity, in violation of section 15 has engaged in corrupt misconduct and shall pay restitution to the general treasury of the contracting governmental entity to compensate the governmental entity for all costs and expenses associated with the breach, including costs and losses involved in securing a new contract if that becomes necessary.

*Id.* The subsection also extends liability to any bookkeeper for a contract holder and to any "person acting on behalf of the governmental entity" if that person "obtains knowledge" of a section 15 violation and "intentionally fails to notify" the appropriate government officer within ten days.[2] *Id.*

Turning to the other parts of section 17,[3] subsection 2 disqualifies "[a]ny person who makes or causes to be made any contribution intended to promote or influence the result of an election on a ballot issue" from holding a sole source contract related to that issue. Colo. Const. art. XXVIII, § 17(2). Subsection 3 states that, "if a contract holder intentionally violates section 15 or section 17(2), as contractual damages that contract holder shall be ineligible to hold any sole source government contract, or public employment with the state or any of its political subdivisions, for three years." Colo. Const. art. XXVIII, § 17(3). Subsection 4 penalizes any

"knowing violation" of the Amendment by a government official with removal from office, disqualification from future office, and other "misconduct or malfeasance" consequences. Colo. Const. art. XXVIII, § 17(4). Finally, subsection 5 gives standing to enforce the Amendment to any registered voter of the state. Colo. Const. art. XXVIII, § 17(5).

Next, section 13 in Amendment 54 replaces the prior version of section 13 in article XXVIII and amends the effective date of the new law. Colo. Const. art. XXVIII, § 13. It maintains that the Campaign and Political Finance Act remains in effect as it was on December 6, 2002, with the new Amendment 54 provisions taking effect on December 31, 2008. *Id.* The section, both pre- and post-Amendment 54, concludes with: "Legislation may be enacted to facilitate its operations, but in no way limiting or restricting the provisions of this article or the powers herein granted." *Id.;* Colo. Const. art. XXVIII, § 13 (2003).

Finally, Amendment 54 adds four new definitions to the existing definitions in article XXVIII, section 2. The first states:

'Contract holder' means any non-governmental party to a sole source government contract, including persons that control ten percent or more shares or interest in that party; or that party's officers, directors or trustees; or, in the case of collective bar-

---

**2.** This final sentence reads:

If a person responsible for the bookkeeping of an entity that has a sole source contract with a governmental entity, or if a person acting on behalf of the governmental entity, obtains knowledge of a contribution made or accepted in violation of section 15, and that person intentionally fails to notify the secretary of state or appropriate government officer about the violation in writing within ten business days of learning of such contribution, then that person may be contractually liable in an amount up to the above restitution.

Colo. Const. art. XXVIII, § 17(1).

**3.** Together, the remaining subsections of section 17 state:

(2) Any person who makes or causes to be made any contribution intended to promote or influence the result of an election on a ballot issue shall not be qualified to enter into a sole source government contract relating to that particular ballot issue.

(3) The parties shall agree that if a contract holder intentionally violates section 15 or section 17(2), as contractual damages that contract holder shall be ineligible to hold any sole source government contract, or public employment with the state or any of its political subdivisions, for three years. The governor may temporarily suspend any remedy under this section during a declared state of emergency.

(4) Knowing violation of section 15 or section 17(2) by an elected or appointed official is grounds for removal from office and disqualification to hold any office of honor, trust or profit in the state, and shall constitute misconduct or malfeasance.

(5) A registered voter of the state may enforce section 15 or section 17(2) by filing a complaint for injunctive or declaratory relief or for civil damages and remedies, if appropriate, in the district court.

Colo. Const. art. XXVIII, § 17(2)-(5).

gaining agreements, the labor organization and any political committees created or controlled by the labor organization. Colo. Const. art. XXVIII, § 2(4.5).

Amendment 54 broadly defines immediate family member to include "any spouse, child, spouse's child, son-in-law, daughter-in-law, parent, sibling, grandparent, grandchild, stepbrother, stepsister, stepparent, parent-in-law, brother-in-law, sister-in-law, aunt, niece, nephew, guardian, or domestic partner."[4] Colo. Const. art. XXVIII, § 2(8.5).

Section 2(14.4) provides the crucial definition of sole source government contract that applies throughout the Amendment.[5] Under Amendment 54, a sole source contract is "any government contract that does not use a public and competitive bidding process soliciting at least three bids prior to awarding the contract." Colo. Const. art. XXVIII, § 2(14.4). To be considered a sole source contract, the subsection requires that the cumulative value of all the holder's contracts with all government entities for that calendar year exceed $100,000, indexed to inflation. *Id.* The subsection further expands the definition of sole source contract to include collective bargaining agreements. In pertinent part:

> A sole source government contract includes collective bargaining agreements with a labor organization representing employees, but not employment contracts with individual employees. Collective bargaining agreements qualify as sole source government contracts if the contract con-

fers an exclusive representative status to bind all employees to accept the terms and conditions of the contract. *Id.*

The final subsection provides an expansive definition of "state or any of its political subdivisions." Colo. Const. art. XXVIII, § 2(14.6). This phrase, which essentially delineates the scope of the Amendment, includes "the state of Colorado and its agencies or departments, as well as the political subdivisions within this state including counties, municipalities, school districts, special districts, and any public or quasi-public body that receives a majority of its funding from the taxpayers of the state of Colorado." *Id.*

Before proceeding, we emphasize the distinction between the new additions to article XXVIII of the Colorado Constitution and the provisions that existed prior to Amendment 54. The majority of article XXVIII, including the broad purpose statement in section 1 explaining why campaign finance laws are necessary, remains unaffected by the Amendment. The continued validity of these older provisions is not at issue. For this reason, we concern ourselves solely with those changes and additions wrought by Amendment 54.

### B. Procedural Posture

This case represents the consolidation of two facial challenges filed shortly after the effective date of Amendment 54. The Ritchie plaintiffs[6] filed a motion for a prelimi-

---

**4.** The plaintiffs stressed the fact that this definition of family does not include uncles. We view this omission not as a purposeful exception, but as an inadvertent drafting error.

**5.** The entire definition reads:

> "Sole source government contract" means any government contract that does not use a public and competitive bidding process soliciting at least three bids prior to awarding the contract. This provision applies only to government contracts awarded by the state or any of its political subdivisions for amounts greater than one hundred thousand dollars indexed for inflation per the United States bureau of labor statistics consumer price index for Denver–Boulder–Greeley after the year 2012, adjusted every four years, beginning January 1, 2012, to the nearest lowest twenty five dollars. This

amount is cumulative and includes all sole source government contracts with any and all governmental entities involving the contract holder during a calendar year. A sole source government contract includes collective bargaining agreements with a labor organization representing employees, but not employment contracts with individual employees. Collective bargaining agreements qualify as sole source government contracts if the contract confers an exclusive representative status to bind all employees to accept the terms and conditions of the contract.

Colo. Const. art. XXVIII, § 2(14.4).

**6.** The "Ritchie plaintiffs" include Daniel Ritchie, a Denver businessman and philanthropist currently serving as chief executive officer of the Denver Center for the Performing Arts, which holds sole source contracts with the City and

nary injunction on February 19, 2009, while the Dallman plaintiffs [7] filed a motion for a preliminary injunction on March 10, 2009. Because both groups alleged similar constitutional deficiencies and sought to enjoin the entire Amendment, the trial court consolidated the cases.

Specifically, both groups argued that a preliminary injunction was necessary because Amendment 54 violated their First Amendment rights to free speech and free association. The Dallman plaintiffs, who represent organized labor, also alleged that Amendment 54 violated the single subject requirement, Colo. Const. art V, § 1(5.5), and that Amendment 54 unfairly singled out labor organizations holding public collective bargaining agreements, thereby violating their rights under the Equal Protection Clause of the Fourteenth Amendment.

At the preliminary injunction hearing, three witnesses testified for the plaintiffs: Daniel Ritchie, the chairman and CEO of the Denver Center for Performing Arts (DCPA) and board member of other nonprofit organizations; Robert Fitzgerald, an Aurora City Council member running for reelection; and David Clark, president of School District 14 Classroom Teachers Association (CTA).

Ritchie testified that he was the chancellor of the University of Denver for sixteen years. He stated that the University of Denver,

through the graduate school of social work, has numerous contracts with governmental entities relating to welfare and child care. DCPA leases and rents property from Denver, Denver rents one floor of a building from DCPA, and Denver provides parking spaces for DCPA's use. Ritchie further testified that neither board members nor the DCPA itself profits from its contracts with Denver. Ritchie believed that a violation of Amendment 54 by the DCPA would end its existence and have a substantial detrimental effect on the City of Denver as well. Ritchie made numerous contributions to political campaigns prior to Amendment 54 but has since only contributed to federal campaigns.

Fitzgerald is a member of the Aurora City Council. He was originally appointed to the city council in 2004 and was seeking reelection in 2009. Fitzgerald testified that he expected the election to be highly competitive and speculated that he would need to raise about $50,000 for his campaign to be effective. He declined to let a friend work as his treasurer because he was afraid of subjecting another individual to liability under Amendment 54. Fitzgerald testified that he was having trouble raising funds, claiming that many potential contributors were unsure of Amendment 54's reach and would not contribute until this case was decided. He also testified that he would have taken contribu-

County of Denver; Patrick Hamill, the chief executive officer of the construction company Oakwood Homes, which holds sole source contracts with multiple special government districts and the Denver Public Schools, and a board member of two nonprofits with sole source contracts affected by Amendment 54; Charles V. Brown Jr., a member of the Denver City Council and board member of Visit Denver, a nonprofit with an affected sole source contract with the City of Denver that is responsible for marketing Denver tourism; Matthew R. Dalton, a director and shareholder for the law firm Grimshaw & Harring, P.C., which holds multiple sole source contracts with political subdivisions and special districts to provide legal services; The Children's Hospital, a renowned children's hospital with 3,000 full-time employees and over 2,000 volunteers that holds sole source government contracts with the City of Denver as part of Medicaid, nursing services, and health care services; and The Colorado Seminary, a nonprofit organization that owns the University of Denver, which itself holds sole source government contracts with the state and

various subdivisions including the state, school districts, and Denver and Jefferson Counties for childhood education, mental health services, and instructional materials.

7. The "Dallman plaintiffs" represent organized labor interests and include Kerrie Dallman, a registered elector in this state who serves as the president of the Jefferson County Education Association and sits on the organization's small donor committee; Laurence Botnick, a voter in Denver and former candidate for the Denver School Board; the School District 14 Classroom Teachers Association, a labor organization through which the school district's certified employees negotiate their collective bargaining agreement among other union functions; the School District 14 Classroom Teachers Association Political Action Committee, a political donor committee branch of the School District 14 Classroom Teachers Association; and the Aurora Fire Fighters Protection Association, a labor organization through which the local firefighters negotiate their collective bargaining agreement with the municipality.

tions from union political action committees (PACs), but, under Amendment 54, union PACs are prohibited from contributing to his campaign. Fitzgerald was also unsure of which specific individuals are barred from contributing, mainly due to the incomplete state database of sole source government contractors.

Clark is the president of a labor organization, the CTA, which has a collective bargaining agreement with the state. Clark testified that, because of its collective bargaining agreement, the CTA was a sole source government contractor under Amendment 54. The CTA formed a PAC to support candidates for the school board through endorsements and financial contributions. Clark testified that the PAC does not contribute to any candidates for office other than school board members. Prior to Amendment 54, individual union members contributed funds to the PAC that were then used to support favored candidates. Clark testified that the CTA wanted to contribute to school board candidates in November of 2009, but Amendment 54 prohibited any contribution from the PAC.

On August 12, 2009, the trial court issued a preliminary injunction enjoining the enforcement of all but section 16 of Amendment 54. The trial court found that the Amendment facially violated "the rights of free speech and association guaranteed by the First Amendment to the Constitution of the United States." The trial court's primary reason for striking the Amendment rested in its overbreadth, which "permeate[d] the [A]mendment" but was especially troublesome in sections 2(8.5), 15, 17(1), and 17(4). The trial court also found several subsections void for vagueness and struck down section 17(2)'s prohibition on contributing to ballot measures because it unconstitutionally chilled First Amendment rights. Regarding claims specific to the Dallman plaintiffs and labor unions, the trial court concluded that there was "simply no legitimate reason for the government to impose greater restrictions on the First Amendment interests of public sector unions." Consequently, it struck Amendment 54's labor organization provisions for violating the First and Fourteenth Amendments.[8]

## II. Standard of Review

■ The trial court rendered its findings through the lens of a preliminary injunction, structuring its written decision around the six elements a court must consider before issuing a preliminary injunction.[9] *See Rathke v. MacFarlane*, 648 P.2d 648, 653–54 (Colo.1982); *Kourlis v. Dist. Ct.*, 930 P.2d 1329, 1335 (Colo.1997). Usually, we review the grant or denial of injunctive relief for an abuse of discretion, deferring to the factual

---

**8.** The trial court dismissed the Dallman plaintiffs' claim that Amendment 54 violated the single subject requirement because the objectors failed to appeal the title decision to the state title board within seven days. § 1–40–107, C.R.S. (2009). The Dallman plaintiffs do not question this ruling on appeal, and we affirm the trial court's dismissal.

Similarly, the trial court held that the $100,000 threshold level required to qualify as a sole source government contract in section 2(14.4) did not apply to collective bargaining agreements for two reasons, both based in the Amendment's drafting. First, the $100,000 requirement preceded the two sentences specifically including collective bargaining agreements and makes no mention of them. Second, section 2(14.4) definitively states that "[c]ollective bargaining agreements qualify as sole source government contracts if the contract confers an exclusive representative status to bind all employees to accept the terms and conditions of the contract;" so qualifying as a sole source contract requires only exclusive status and is in no way

contingent on any monetary threshold. In any case, this holding does not affect our analysis today because we strike any and all application to labor organizations for separate First and Fourteenth Amendment reasons.

**9.** The six elements a court must consider in issuing a preliminary injunction are:

(1) a reasonable probability of success on the merits;

(2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief;

(3) that there is no plain, speedy, and adequate remedy at law;

(4) that the granting of a preliminary injunction will not disserve the public interest;

(5) that the balance of equities favors the injunction; and

(6) that the injunction will preserve the status quo pending a trial on the merits.

*Rathke*, 648 P.2d at 653–54 (internal citations omitted).

judgment of the trial court, *Rathke*, 648 P.2d at 653, but here we review this facial challenge de novo because "the issue being reviewed concerns only legal, rather than factual questions." *State ex rel. Salazar v. Cash Now Store, Inc.*, 31 P.3d 161, 164 (Colo.2001).

■ The first element of the preliminary injunction analysis, and the most important in the case at bar, is "a reasonable probability of success on the merits," which requires the court to substantively evaluate the issues as it would during trial. *Rathke*, 648 P.2d at 654. Thus, the vast majority of the trial court's decision and the sole issue raised on appeal concerns the merits of the case, which the trial court evaluated from the same perspective and with the same effect in the hearing as it would at trial. *See* C.R.C.P. 65(a)(2) (allowing consolidation of a preliminary injunction hearing with the actual trial and, if consolidation is not possible, directing that the hearing record become part of the trial record without repetition of the evidence).[10]

■ We note that, while we review this appeal of the trial court's preliminary injunction according to the six *Rathke* elements, our substantive findings on the merits of the case would not differ if reviewed in the context of a permanent injunction. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."[11] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *see also City of Golden v. Simpson*, 83 P.3d 87, 96 (Colo.2004). Thus, while we review pre-liminary injunctions for likelihood of success on the merits and permanent injunctions for actual success on the merits, the legal criteria and analytical process are essentially the same. *See* C.R.C.P. 65(a)(2) (stating that, when the evidence admitted is identical, success on the merits is defined according to the issue's underlying legal rules).

We apply these basic rules to each of the different issues presented on appeal. Each constitutional challenge to Amendment 54 has its own unique analytical framework and corresponding standard of review. Therefore, we devote the following three sections to addressing each of the issues the plaintiffs present.

## III. Contribution Limits under *Buckley*

We first consider whether Amendment 54's absolute ban on contributions from sole source contractors is constitutional under the First Amendment,[12] which provides that the government "shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. We must examine Amendment 54's contribution ban using the United States Supreme Court's case law specific to this type of First Amendment restriction.

■ We begin by distinguishing contribution limits, at issue here, from expenditure limits. *See Citizens United v. Fed. Election Comm'n*, —— U.S. ——, 130 S.Ct. 876, 908, —— L.Ed.2d —— (2010); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 134–35, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (overruled by *Citizens United*, 130 S.Ct. at 913, as applied to independent campaign expenditures but not as applied to campaign contri-

---

**10.** Citing C.R.C.P. 65(a)(2) (2009), the trial court raised the question of whether the materials, evidence, and arguments submitted at the preliminary injunction hearing could be consolidated with the trial on the merits. The State objected; hence, our review of the record takes place in the context of a preliminary injunction rather than a permanent injunction.

**11.** Aside from the trial court assessing the merits of the case rather than a likelihood of success on the merits, the elements of a permanent injunction simply eliminate irrelevancies from the *Rathke* preliminary injunction elements.

A party seeking a permanent injunction must show that: (1) the party has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

*Langlois v. Bd. of County Comm'rs*, 78 P.3d 1154, 1158 (Colo.App.2003).

**12.** In this Part we do not address the contribution bans imposed on labor organizations or Amendment 54's prohibition on contributions to ballot issues. We discuss these provisions in Parts V and VI, respectively.

butions). In this context, expenditures comprise money spent directly advocating for or against a particular issue or candidate. *Citizens United,* 130 S.Ct. at 910 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate."). Thus, expenditure limits are a direct restraint on an individual's ability to express his or her position and are subject to strict scrutiny. *Id.* at 908; *Buckley,* 424 U.S. at 44–45, 96 S.Ct. 612. Conversely, campaign contributions encompass money given to a candidate or party, who then determines how it will be spent. Contribution limits only implicate the right to associate and approve of another's message and, therefore, are subject to a lower standard of scrutiny, though the Supreme Court has still termed it an "exacting standard." *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 386–87, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Moreover, expenditures and contributions differ in their potential for a corrupting influence. The opportunity for a quid pro quo arrangement is an inherent danger in contributions to candidates but not in independent expenditures.[13]

The Supreme Court decision in *Citizens United* addressed only expenditure limits and disclosure requirements; thus, it does not control our analysis of Amendment 54's contribution limits. *Citizens United,* 130 S.Ct. at 909 ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny.").

■ In *Buckley,* the Supreme Court recognized that contribution limits "implicate fundamental First Amendment interests"— the freedoms of political expression and political association. 424 U.S. at 15, 23, 96 S.Ct. 612. Contribution limits, however, are unlike expenditure limits because they are not a direct restraint on speech. *Id.* at 21, 96 S.Ct. 612. This is because contribution limits only restrict a contributor's ability to financially support a candidate; they do not "infringe the contributor's freedom to discuss candidates and issues." *Id.* at 21, 96 S.Ct. 612. Therefore, such limits only marginally infringe protected speech under the First Amendment. *Id.* at 20, 96 S.Ct. 612.

■ More importantly, contribution limits also "impinge on protected associational freedoms." *Id.* at 21, 96 S.Ct. 612. Contribution limits restrict "one important means of associating with a candidate or committee, but leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *Id.* at 22, 96 S.Ct. 612. This comparison of speech and association freedoms led the Supreme Court in *Buckley* to find that "the primary First Amendment problem raised by ... contribution limitations is their restriction of one aspect of the contributor's freedom of political association." *Id.* at 24, 96 S.Ct. 612.

■ The Supreme Court in *Buckley* concluded that contribution limits are not subject to strict scrutiny but may violate the First Amendment if they are not closely drawn to match a sufficiently important government interest.[14] *Randall v. Sorrell,* 548

13. *Citizens United* held that "independent expenditures ... do not give rise to corruption or the appearance of corruption." 130 S.Ct. at 909; *see id.* at 908 (holding that the absence of prearrangement and coordination for independent expenditures "alleviates the danger that expenditures will be given as a quid pro quo....").

14. The State argues at great length on appeal that *Buckley* does not provide the proper analysis for Amendment 54's restrictions. Instead, it argues that sole source government contractors (including directors, officers, and ten-percent shareholders) are essentially public employees, and, under Supreme Court precedent, public employees have less First Amendment protections than private individuals. Therefore, the State

believes that a balancing test is the appropriate tool to determine the constitutionality of Amendment 54. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 567, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). We do not believe a blanket rule that considers any sole source contractor a public employee is consistent with the First Amendment. For example, we cannot constitutionally consider plaintiff Ritchie, who serves as chairman of the board for a nonprofit organization without compensation, to be a public employee subject to a lessened protection of his free speech and association rights. Although in some cases a sole source contractor may be very similar to a public employee, we do not believe that a rule equating all sole source government contractors with public employees is

U.S. 230, 247, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (quoting *Buckley*, 424 U.S. at 21, 24, 96 S.Ct. 612 (holding that a state must demonstrate "a sufficiently important interest and employ[ ] means closely drawn to avoid unnecessary abridgment of associational freedoms.")). We adopt the *Buckley* framework here.

Our first step is to determine whether Amendment 54's contribution limits are supported by a sufficiently important government interest. *Id.* As stated in Amendment 54 and in the 2008 State Ballot Information Booklet (Blue Book), the purpose of the Amendment is the prevention of an appearance of impropriety[15] in awarding sole source government contracts.[16] Prior to Amendment 54, the holder of a sole source contract could contribute to the campaign of a government official with discretion over awarding that contract, subject to existing contribution limits contained in article XXVII of the Colorado Constitution.[17] The State argues that the current system creates the opportunity for actual corruption in contract awards and, almost of equal importance, creates the public perception of quid pro quo arrangements between government officials and sole source contractors. The Supreme Court in *Buckley* held that both of these interests—preventing corruption and preventing the appearance of corruption—are sufficiently important to justify campaign contribution limits. 424 U.S. at 27, 96 S.Ct. 612. Therefore, the government interest in preventing the appearance impropriety is sufficiently important to justify some limits on campaign contributions. The appearance of impropriety, however, is not sufficient to justify any and all restrictions on First Amendment freedoms. At some point, the appearance of impropriety is simply too attenuated or hypothetical to justify the restriction, and this court is constitutionally required to intervene.

Because we find a sufficiently important government interest in this case, we must determine whether Amendment 54 is closely drawn to prevent impropriety or the appearance thereof. *Id.* at 24, 96 S.Ct. 612. The contribution limits at issue in *Buckley* were directed towards the problem of large campaign contributions and the effect they had in the electoral process. *Id.* at 28, 96 S.Ct. 612. That is not the focus here because campaign contribution limits in Colorado are already in place.[18] Instead, Amendment 54 imposes an absolute ban on contributions from sole source contractors in addition to the preexisting contribution limits. The Amendment's contribution ban restricts not only the amount of permissible contributions, but also from whom contributions are allowed. An absolute ban is a serious impairment of protected First Amendment rights.[19]

appropriate. Moreover, we "must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007).

15. The trial court considered the distinction between corruption and impropriety important in this case. Although we agree that the distinction may be important in some instances, it does not affect our decision today.

16. The Blue Book stated that Amendment 54 "promotes civic trust and government transparency." Section 15 of the Amendment begins with: "Because of a presumption of impropriety between contributions to any campaign and sole source government contracts...."

17. Article XXVIII, section 3 of the Colorado Constitution specifies the contribution limits for state campaigns. Aggregate contributions from individuals during primary elections are limited to $500 for campaigns for the governor, secretary of state, state treasurer or attorney general,

§ 3(1)(a), and $200 for contributions to candidates for the state senate, house of representatives, board of education, University of Colorado regent, or district attorney, § 3(1)(b). Contributions from small donor committees are limited to $5,000 for candidates for the governor, secretary of state, state treasurer, or attorney general, § 3(2)(a), and $2,000 for candidates for the state senate, house of representatives, board of education, University of Colorado regent, or district attorney, § 3(2)(b). Additionally, no political party may accept contributions from an individual that exceed $3,000, aggregated for all levels of state government. § 3(3)(a). Corporations and labor organizations are prohibited from contributing to candidate committees and political parties. Colo. Const. art. XXVIII, § 3(4)(a).

18. *See supra* note 17.

19. Other jurisdictions have held that absolute bans are not per se unconstitutional. *See Inst. of Gov't Advocates v. Fair Political Practices Comm'n*, 164 F.Supp.2d 1183, 1191 (E.D.Cal.

When reviewing Amendment 54's tailoring, we examine the proportionality of its restrictions to the government's interest. *Randall,* 548 U.S. at 249, 126 S.Ct. 2479. The Supreme Court has used several tools to gauge a statute's tailoring, including: (1) whether the limitation prevents candidates from amassing resources necessary to mount an effective campaign, *Buckley,* 424 U.S. at 21, 96 S.Ct. 612; (2) whether the statute is unconstitutionally overbroad in that it unreasonably stifles protected speech, *McConnell,* 540 U.S. at 231–32, 124 S.Ct. 619; and (3) whether the limits provide significant advantages for an incumbent, *Randall,* 548 U.S. at 248–49, 126 S.Ct. 2479. There is no allegation in this case that Amendment 54 advantages incumbents, and therefore, we only address the candidates' ability to amass resources and the plaintiffs' claims of overbreadth.

### A. Ability to Amass Resources

■ When analyzing campaign contribution limits post-*Buckley,* the Supreme Court has consistently considered whether the law would have "any dramatic adverse effect on the funding of campaigns" and whether the limits prevent "candidates and political committees from amassing the resources necessary for effective advocacy." *Randall,* 548 U.S. at 247, 126 S.Ct. 2479. A contribution limit must "not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political par-

ties." *Buckley,* 424 U.S. at 29, 96 S.Ct. 612. Subsequent cases have clarified that courts should examine the effect that the restriction will have on the party ultimately using the money for political speech. *Randall,* 548 U.S. at 247, 126 S.Ct. 2479. Accordingly, we must examine whether Amendment 54 will affect the ability of individuals running for political office in Colorado to amass the resources necessary for effective advocacy. *Id.* at 247, 126 S.Ct. 2479.

Although Amendment 54's absolute ban on contributions from sole source contractors severely limits the ability of those individuals to associate with a candidate or cause through monetary contributions, the limited record in this case does not provide adequate information for us to determine whether the contribution limits are so stringent that they will undermine the potential for robust and effective discussion of candidates and campaign issues. The evidence presented to the trial court includes statements by individuals running for elected office in Colorado. These candidates claim that the Amendment has restricted their ability to effectively raise funds for their campaign, due mostly to potential contributors' uncertainty about the scope of the Amendment.[20]

Although this anecdotal evidence cannot be disregarded, we conclude that it is too conjectural to form the basis of our decision today. We recognize that, at this early stage of the Amendment's existence, it is difficult to provide empirical proof of its effect on campaign coffers. But speculation on the

2001); *N.C. Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 716 (4th Cir.1999); *Casino Ass'n of La. v. Louisiana ex rel. Foster,* 820 So.2d 494, 504 (2002). *But see Fair Political Practices Comm'n v.Super. Ct.,* 25 Cal.3d 33, 45, 157 Cal.Rptr. 855, 599 P.2d 46 (Cal.1979) (holding that a complete ban on all contributions by lobbyists was not closely drawn under *Buckley* ). But the Supreme Court has held that in considering whether a limit is closely drawn, "the amount, or level, of that limit could make a difference." *Randall,* 548 U.S. at 247, 126 S.Ct. 2479.

20. Robert Fitzgerald sits on the Aurora City Council. Fitzgerald ran for reelection in 2009 and testified at trial that he was concerned about Amendment 54's effect on his ability to raise funds. Fitzgerald claimed that previous contributors were unwilling to contribute to his

campaign until this case has been decided. Furthermore, he opined that Amendment 54 has impacted his ability to raise funds for his election. Of particular concern to Fitzgerald and his contributors was the Amendment's unclear scope, the incomplete state database of sole source contracts, the possibility of a "planted" check, and the possibility of harassment under the citizen-suit provision.

Plaintiff Charles V. Brown Jr. is a member of the Denver City Council and intends to run for reelection in 2011. Brown is concerned that Amendment 54 prevents him from contributing to his own campaign and is concerned that his family members will not be able to contribute either. He did not allege any other specific instances of his inability to acquire campaign funds.

part of the court into whether candidates will be able to mount effective campaigns is unwise. We find that the record is insufficient for us to determine Amendment 54's cumulative monetary effect. However, this does not prevent us from considering the correlative overbreadth challenge to the Amendment.

### B. Overbreadth

Instead of focusing on the ability of candidates to raise funds, our overbreadth analysis focuses on whether the law restricts a substantial amount of protected speech judged in relation to its legitimate purpose. The plaintiffs in this case argue, and the trial court agreed, that Amendment 54 is substantially overbroad on its face.

Generally, a facial challenge can only succeed if the complaining party can show that the law is unconstitutional in all its applications. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In a facial challenge asserting that a law is unconstitutional under the First Amendment, however, a showing that the law is overbroad may be sufficient to invalidate its enforcement.[21] *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 128 S.Ct. 1184, 1191 n. 6, 170 L.Ed.2d 151 (2008). "The showing that a law punishes a 'substantial' amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). An amendment will not be invalidated for overbreadth simply because the plaintiff alleges that there are some impermissible applications. *Taxpayers for Vincent,* 466

U.S. at 800, 104 S.Ct. 2118. We require substantial overbreadth because of the purpose of the overbreadth doctrine—"the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court." *Id.*

The Supreme Court has not been consistent in addressing overbreadth under *Buckley's* "closely tailored" standard.[22] However, the Supreme Court has repeatedly analyzed, and in some cases invalidated, statutes based on their overbroad limits on campaign contributions. *See McConnell,* 540 U.S. at 231–32, 124 S.Ct. 619 (Rehnquist, C.J., plurality opinion) (holding a contribution restriction for minors was invalid because the statute was not "closely drawn to avoid unnecessary abridgment of First Amendment freedoms"); *Buckley,* 424 U.S. at 25, 96 S.Ct. 612 (holding that a contribution limit may be upheld "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms"); *Nixon,* 528 U.S. at 387–88, 388 n. 3, 120 S.Ct. 897 (combining *Buckley's* "closely tailored" test with *Buckley's* overbreadth test).

*McConnell's* method of addressing close tailoring is especially telling on this point.[23] Chief Justice Rehnquist authored the section of the plurality opinion relating to contribution restrictions on minors. *McConnell,* 540 U.S. at 231, 124 S.Ct. 619. He held that the restriction was not closely tailored, but focused on the restriction of a minor's right of association and not on the effect it had on candidates. *Id.* at 232, 124 S.Ct. 619. Therefore, following the Supreme Court's example, a law is not closely tailored if it impermissibly interferes with protected associational rights even though there is no showing of its effect on campaign treasuries. We think this is especially true here because

---

21. A court may consider a statute's overbreadth even though it may be constitutionally unobjectionable in its application in the instant case. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 800 n. 19, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). We decline to address whether Amendment 54 is constitutional as applied to specific plaintiffs, but this does not prevent us from addressing the plaintiffs' facial challenge.

22. The Supreme Court in *Citizens United* noted that Buckley did not address overbreadth, but this discussion was in the context of independent expenditure limitations. *Citizens United,* 130 S.Ct. at 901–02.

23. *Citizens United* did not affect the section of *McConnell* relating to campaign contributions. *See Citizens United,* 130 S.Ct. at 913.

Amendment 54 only applies to a select group of individuals, but it absolutely eliminates their ability to associate through monetary contributions.

The overbreadth doctrine grew "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech. . . ." *Hicks*, 539 U.S. at 119, 123 S.Ct. 2191. "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* Invalidating an overbroad law reduces the "social costs caused by the withholding of protected speech." *Id.*

Accordingly, we must determine Amendment 54's plainly legitimate sweep and then analyze the proportionality of its restrictions on protected First Amendment activity. First, we conclude that the plainly legitimate sweep of Amendment 54 is the elimination of an appearance of impropriety in the process of awarding no-bid government contracts. *See Buckley*, 424 U.S. at 27, 96 S.Ct. 612. Second, we must analyze whether Amendment 54 punishes a substantial amount of protected expression—in this case political contributions—in relation to its plainly legitimate sweep. We will examine the Amendment's contested provisions individually to determine their overbreadth, but our ultimate determination on Amendment 54's overbreadth rests on whether the provisions, taken as a whole, restrict a substantial amount of protected speech.[24]

### 1. Whether Amendment 54 Is Overbroad in its Application to "Any Government Contract" that Does Not Solicit at Least Three Bids

Section 15 of Amendment 54 prohibits campaign contributions by holders of "sole source government contracts." Colo. Const. art. XXVIII, § 15. "Sole source government contract" is defined as "any government contract that does not use a public and competitive bidding process soliciting at least three bids prior to awarding the contract." Colo. Const. art. XXVIII, § 2(14.4). Because Amendment 54's goal is eliminating the appearance of impropriety, it naturally should encourage competitive bidding where possible and apply only to contracts where the government has some discretion in choosing a contractor. Only under these circumstances are pay-to-play arrangements a danger.

But Amendment 54 is unqualified in its application. Thus, the Amendment covers even those contracts that are not susceptible to competitive bidding as well as situations where competitive bidding is undesirable. As noted in the Blue Book, it would apply in situations where competitive bidding is seen by the State as inappropriate, such as when the contract is for goods that can only be supplied by one vendor.[25] It would also apply in rural areas where there may not be three bidders willing and able to fulfill the contract.[26] Therefore, the Amendment, as

---

24. Although we address the contested provisions individually, we do not hold that the language of each individual provision is per se unconstitutional and can never be used in the future. Instead, we only examine whether in this case the language taken as a whole renders the Amendment, as written, unconstitutional.

25. The Blue Book listed the following as areas where competitive bidding is not used:
 • Where equipment, accessories, or replacement parts must be compatible
 • Where a sole supplier's item is needed for trial use or testing; and
 • Where public utility services are to be purchased.
 Because Amendment 54 contains no language limiting its application to such areas, they would be considered sole source contracts.

26. To avoid classification as a "sole source contract" under section 2(14.4), the State contends that the government must *solicit*—but need not actually receive—at least three bids. We fail to see how, in a contract that is made available for public bidding, the addition of language requesting at least three bids diminishes the appearance of impropriety.
 For example, bidding for state government contracts is closely regulated under statute. The existing statute requires the State to draft an invitation for bids for any new contract, outlining the requirements for the project and the selection criteria to be used. *See* § 24–103–202(2), C.R.S. (2009). The statute further requires that adequate public notice be provided, e.g., via publication in a newspaper. § 24–103–202(3). Were we to accept the State's argument, the only logical consequence would be

written, applies to a substantial number of state contracts where competitive bidding is either not feasible or not appropriate.[27]

The purpose of Amendment 54 is not furthered by such an over-inclusive definition of "sole source contract;" its broad application to all contracts that do not solicit three bids is not sufficiently directed toward eliminating the appearance of impropriety. Because Amendment 54 applies to "any government contract" that does not solicit three bids, without including any further limiting language, we find this provision to be overbroad.

## 2. Whether Amendment 54 Is Overbroad in its Application to "Any Political Party" and "Any Candidate for Any Elected Office"

 Amendment 54 prohibits all contributions from sole source government contractors "for the benefit of any political party or for the benefit of any candidate for any elected office of the state or any of its political subdivisions." Colo. Const. art. XXVIII, § 15. By its terms, then, the Amendment applies to state, county, and local governments, as well as to any of the over three thousand special districts within the state.

For example, state legislators, school board members, county commissioners, and board members for water districts are prohibited from accepting contributions from sole source government contractors regardless of their ability to influence contract awards or their relation to the contractor. As written, Amendment 54 would require us to find an appearance of impropriety in a contribution, already limited in size under article XXVIII, to any political candidate. It

would require us to assume, for instance, that a small contribution to a candidate for the general assembly automatically leads to a public perception that the donor will receive some quid pro quo benefit from a city or special district with which the donor holds a sole source contract. As noted above, the government's interest in eliminating the appearance of impropriety is not without bounds, and in this case we cannot sacrifice First Amendment freedoms to an implausible perception of impropriety that links every contribution to an illicit arrangement extending to all levels of state government. Thus, this provision of Amendment 54 is over-inclusive in light of its plainly legitimate sweep. The Amendment fails to tailor its prohibitions towards those who have some control over awarding no-bid contracts, which would be directly correlated to its purpose of preventing the appearance of impropriety.[28]

The State and amicus Clean Government Colorado argue that this type of statewide ban is not unique and cite to cases upholding similar bans in other jurisdictions. The cases the State relies on for this proposition, however, are distinguishable. In *Ysursa v. Pocatello Education Association,* the Supreme Court upheld an Idaho law that prohibited payroll deductions for political activities. —— U.S. ——, 129 S.Ct. 1093, 1096, 172 L.Ed.2d 770 (2009). A union challenged the statute, arguing that it violated its members' First Amendment rights. *Id.* The Supreme Court held that the statute did not restrict political speech but only declined to promote speech through payroll deductions. *Id.* This distinction between restriction and promotion formed the basis for the Supreme Court's holding. *Id.* 129 S.Ct. at 1099.

to prohibit the State from publicly requesting only one or two bids, rather than the required three. Given the existing statutory protections, it is difficult to see how requiring the State to request three or more bids could, of itself, conceivably increase transparency, enhance perceived fairness, or otherwise diminish the appearance of impropriety in the bidding process.

Thus, the only way to give meaning to the "three bids" language is to read it as requiring the receipt of three bids.

**27.** Some of the other contracts suggested by the plaintiffs to be inappropriate for inclusion under Amendment 54 are Medicaid contracts, collective bargaining agreements, contracts between Den-

ver and the DCPA, and personal services contracts where experience and knowledge heavily affect the quality of performance.

**28.** We note that other states have enacted statutes addressing the problem of quid pro quo arrangements, some of which are tailored to impact only those officials with discretion to award contracts. *See, e.g.,* S.C.Code Ann. § 8–13–1342; Ohio Rev.Code Ann. § 3517.093 (2009) (held unconstitutional because of procedural infirmity in *United Auto Workers v. Brunner,* 182 Ohio App.3d 1, 911 N.E.2d 327, 333 (10th Dist. 2009)).

Amendment 54, on the other hand, is undoubtedly a restriction on political speech. Unlike the *Ysursa* Court, we are not addressing how contributions can be made but rather whether a complete ban on all contributions can be applied to all levels of government. Thus, even though *Ysursa* upheld a statewide prohibition that applied to all political contributions, the Supreme Court's decision rested on a distinction that does not apply to Amendment 54.

The State further argues that the application of Amendment 54 to any candidate for any office is similar to a federal prohibition on contributions under 2 U.S.C. § 441c(a), (b) (2006). Section 441c(a) prevents "any person" that holds a certain type of contract with the federal government from contributing to federal campaigns for the contract's duration. Section 441c(b) expressly allows a company that is prohibited from contributing to create a separate segregated fund as an alternative to direct political contributions. As the trial court noted, section 441c addresses only a limited number of contracts and applies only to members of Congress, the President, and the Vice President, thus tailoring its restrictions to individuals with oversight responsibility. That it applies to "any person" holding such a contract is only marginally relevant, especially given that it allows separate segregated funds to be set up by contract holders. Unlike Amendment 54, section 441c applies only to specific contracts and government officials and leaves open a separate avenue to contribute to political campaigns.

Finally, despite the State's urging, we do not find persuasive *Green Party of Connecticut v. Garfield,* 590 F.Supp.2d 288, 338 (D.Conn.2008). In *Garfield,* a federal district court upheld Connecticut's cross-jurisdictional pay-to-play contribution restrictions. *Id.* Connecticut, however, was attempting to reemerge from a wave of corruption scandals, and the district court repeatedly emphasized the importance of eliminating quid pro quo arrangements in light of that state's political

climate. *Id.* at 303–07, 318 (finding specific evidence of corruption to constitute a special justification). In any event, the decision in *Garfield* is not binding on this court.

Accordingly, we find that this provision, judged in relation to the Amendment's purpose of eliminating the appearance of impropriety, oversteps its legitimate sweep and restricts a substantial amount of protected speech.

### 3. Whether Amendment 54's Penalty Provisions Are Overbroad

Amendment 54's penalty provision, section 17, is divided into five subsections, which impose separate penalties for making prohibited contributions, accepting prohibited contributions, and failing to report the discovery of a violation. Colo. Const. art. XXVIII, §§ 17(1) to 17(4). Additionally, section 17(5) provides for an enforcement action that may be filed by any registered Colorado voter. We find that, apart from the restitutionary penalty of subsection (1), every subsection of section 17 penalizes protected First Amendment expression in a manner disproportionately severe to Amendment 54's purpose. The disproportionate punishment serves to chill protected speech and is insufficiently related to eliminating the appearance of impropriety.

Section 17(1) imposes a penalty on "[a]ny person who intentionally accepts contributions on behalf of a candidate committee, political committee, small donor committee, political party, or other entity...." A person who accepts a prohibited contribution under this subsection "has engaged in corrupt misconduct[29] and shall pay restitution to the general treasury" to compensate for expenses associated with the breach. This is a restitutionary remedy that compensates the government for expenses associated with prohibited contributions. It applies only to intentionally accepting a contribution in violation of section 15, which we read to mean a knowing violation of Amendment 54.[30] We

---

**29.** It is not clear whether branding a violator with "corrupt misconduct" was intended to have any legal significance. The ambiguity of this

language does not affect our determination today.

**30.** Other sections of Amendment 54's penalty provisions apply to "intentionally violat[ing]" the

find that this provision is proportionate to and consistent with the legitimate sweep of Amendment 54.

Section 17(1) also sanctions the bookkeeper of an entity with sole source contracts if the bookkeeper discovers a violation of section 15 and does not report it to the secretary of state or appropriate government officer within ten days of the discovery. If the bookkeeper fails to report the discovery of a violation, "then that person may be contractually liable in an amount up to the above restitution." Colo. Const. art. XXVIII, § 17(1). Again, this reporting requirement is directly related to the purpose of the Amendment and is not overbroad. The penalty for a violation by a bookkeeper is not disqualification or removal from office but is instead restitutionary. We find that, when interpreted consistently with the other sections of Amendment 54, section 17(1) provides an appropriately tailored punishment for accepting a prohibited contribution and for a bookkeeper's failure to report the discovery of a section 15 violation.

■ Section 17(3) provides the penalty for an intentional violation by a contract holder. It prohibits a contract holder who intentionally violates section 15 from holding any government contract and from holding public employment for three years.[31] Irrespective of the amount of the prohibited contribution or the ability of the recipient to award contracts, any person violating section 15 faces a severe economic penalty as well as a harsh restriction on employment. We hold that this excessive punishment oversteps Amendment 54's plainly legitimate sweep.

■ Section 17(4) removes any elected or appointed official from office if they knowingly violate section 15. Additionally, such official is disqualified from holding any "office of honor, trust or profit in the state . . . ." Colo. Const. art. XXVIII § 17(4). Finally, a viola-

tion "shall constitute misconduct or malfeasance." *Id.* We find that this provision is similar to section 17(3) in its overbreadth. Section 17(4) calls for removal and disqualification from office—permanently—for any knowing violation regardless of its severity. A one-size-fits-all penalty may be appropriate when the sanction is a monetary fine, but here the severity of the penalty is disproportionate to Amendment 54's purpose.

■ Finally, section 17(5) allows any registered voter of Colorado to enforce section 15 or section 17(2) through an injunction, declaratory relief, or civil damages. We do not find this provision to be unconstitutional under the First Amendment. Although it poses an undeniable risk of harassment, that alone is insufficient to invalidate section 17(5).

### 4. Whether Amendment 54 Is Overbroad in Its Prohibition of Contributions for Two Years After the Termination of a Sole Source Contract

■ Section 15 of Amendment 54 bans contributions not only for the duration of the contract but also for two years after its expiration or termination. We understand that the purpose of this provision is to eliminate a perception that, once the contract is at an end, sole source contractors will contribute money to political campaigns in hopes of procuring another contract. In light of our holding that Amendment 54 is overbroad in its application to all no-bid contracts and all candidates, this two-year additional restriction is likewise overbroad. We find that a two-year ban on contributions after the contract is expired inhibits a substantial amount of protected speech, especially considering the overbreadth of Amendment 54's other restrictions.

---

Amendment rather than intentionally accepting prohibited contributions. However, we conclude that section 17(1) was not intended to impose strict liability for accepting any contribution that turns out to be prohibited. The intent of the drafters is only furthered if this section requires some knowledge of an Amendment 54 violation.

**31.** We recognize that the requirement of a knowing or intentional violation lessens the scope of the Amendment's penalties. A knowing or intentional violation, however, necessarily rests on section 15's unconstitutionally vague language, discussed in Part IV of this opinion. Because section 15's scope is vague, so is the basis for liability under these penalty provisions.

### 5. Whether Amendment 54 Is Overbroad in Its Application to Immediate Family Members

██ Amendment 54 not only places restrictions on contributions by the "contract holder" but also on contributions "on behalf of his or her immediate family members." Colo. Const. art. XXVIII § 15. The Amendment defines "immediate family member" as including everyone with at least a third-degree relationship to the contract holder. Colo. Const. art. XXVIII § 2(8.5). The plaintiffs and the trial court struggled with the imprecise language of section 15, attempting to determine whether a contribution "by" a family member was also a contribution "on behalf of" that family member and thus prohibited by the Amendment. To the extent that there is ambiguity, we would read the provision to encompass only those contributions made by the contract holder in the name of his or her immediate family member and those contributions made by immediate family members at the direction of the contract holder.[32] Even applying this narrow interpretation, we hold that the Amendment's application to "immediate family members" is unconstitutionally overbroad.

The language of section 15 unconstitutionally chills protected speech by the family members of sole source contract holders. Instead of running the risk of making a political contribution that violates section 15, immediate family members are likely to refrain from contributing altogether, especially in light of the severe sanctions that the Amendment provides. This chilling effect is exacerbated by section 15's unconstitutionally vague language, which provides no intelligible standard of conduct to which immediate family members must conform. Under Amendment 54, a wide array of actions by the contract holder could reasonably be seen as causing an immediate family member to make a prohibited contribution. If this occurs, the contract holder would then be disqualified from public office and from holding any sole source contract for three years. Immediate family members will be deterred from contributing altogether, a result that oversteps the purpose of Amendment 54 and stifles a substantial amount of protected speech.

The Colorado Constitution already prohibits any individual from being reimbursed by another for a campaign contribution. Colo. Const. art. XXVIII § 3(11). Thus, Colorado already prohibits one of the main concerns of section 15—that a family member will make a contribution in his or her own name while using the funds of another. Amendment 54 expands the scope of prohibited conduit contributions and increases the penalty in a manner disproportionate to its purpose. Therefore, Amendment 54's prohibition on contributions made on behalf of immediate family members serves to substantially chill speech and does little to further its purpose of eliminating the appearance of impropriety.

### 6. Whether Amendment 54 Is Overbroad in Its Application to Nonprofit Organizations

██ Amendment 54 applies even-handedly to both for-profit and nonprofit organizations. *See* Colo. Const. art. XXVIII § 2(4.5). The directors and officers of nonprofit organizations holding sole source government contracts are prohibited from contributing to any candidate or party in the state. Plaintiff Ritchie, chairman and CEO of the DCPA, raised this concern to the trial court. Even though he serves without compensation, by virtue of Ritchie's position he is prohibited from contributing to campaigns or parties in Colorado. Indeed, many nonprofit board members serve for little or no compensation. If Amendment 54 stands as written, nonprofit board members must choose between remaining on the board and exercising their First Amendment rights. We find that this creates a perverse incentive to refrain from charitable activity and does not comport with Amendment 54's purpose.

We agree with the State that, in many ways, non-profit organizations are not much different in character than those that operate for profit. Both are interested in self-pres-

---

32. We recognize that the language of section 15 is not this clear and, by its terms, includes contributions "induced" by the contract holder either "directly or indirectly." We discuss this language later in Part IV addressing the Amendment's vagueness.

ervation and will naturally seek courses of action that benefit the organization. We ultimately conclude, however, that a restriction on First Amendment activity for those that serve a nonprofit falls outside of Amendment 54's plainly legitimate sweep.

## IV. Vagueness

The plaintiffs also contend that Section 15 of Amendment 54 is unconstitutionally vague. As the trial court noted, under the First Amendment a law must be specific enough "so that individuals may assess the burden on their rights to free speech and free association and make informed decisions before acting." *Common Sense Alliance v. Davidson,* 995 P.2d 748, 756 (Colo.2000) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.")); *Independence Inst. v. Coffman,* 209 P.3d 1130, 1137 (Colo.App.2008) ("The vagueness doctrine helps to ensure that a law is sufficiently definite so that citizens will be alerted to the conduct that is proscribed and they may act accordingly, and so that the law will not be arbitrarily applied.").

Applying this to Amendment 54, we must determine whether a contract holder can make an informed decision about whether his conduct is prohibited by the Amendment. Section 15 applies to contributions "on behalf of" immediate family members that the contract holder caused to be made, or induced by any means, directly or indirectly. Colo. Const. art. XXVIII § 15. Thus, it applies to contributions by immediate family members if they were "directly caused," "directly induced," "indirectly caused," or "indirectly induced" by the con-

tract holder. We are not confident that, under these permutations, a contract holder can make an informed decision before acting. Accordingly, we hold that the possible applications of section 15 render it unconstitutionally vague with respect to prohibited contributions of immediate family members.[33]

## V. Application to Labor Organizations and Collective Bargaining Agreements

"[T]he First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas." *Buckley,* 424 U.S. at 15, 96 S.Ct. 612 (internal quotations omitted). Labor organizations and unions, represented here by the Dallman plaintiffs, provide a tangible example of the very associational freedoms the First Amendment protects. Section 2(14.4) explicitly includes collective bargaining agreements as a type of regulated sole source government contract, despite having none of the characteristics of pay-to-play contracts the Amendment was drafted to combat. Similarly, section 2(4.5) subjects "labor organizations and any political committees created or controlled by the labor organization" to the Amendment's prohibitions on contract holders, while omitting and implicitly exempting political committees created by any other type of entity.

Thus, Amendment 54 impermissibly abridges union members' First Amendment rights to associate in order to amplify their political voice. It also violates their Fourteenth Amendment Equal Protection Clause guarantees by treating unions differently than other entities without compelling justification.[34] We discuss each in turn.

### A. The First Amendment

Consistent with the Supreme Court's decision in *Buckley,* we have held that the

33. Of course, we are cognizant of the courts' ability to interpret general language and further clarify the Amendment's scope through case-by-case litigation. We believe, however, that the line between prohibited and protected conduct is so murky under the Amendment that the lower courts would be faced with rewriting the Amendment rather than interpreting it.

34. We note that Colo. Const. art. XXVIII, § 3(4)(a) still prohibits corporations and labor organizations from contributing to candidate committees and political parties; that provision is not at issue here, although it does further minimize the potential for the appearance of corruption in collective bargaining agreements.

First Amendment protects organized labor's freedom to engage in political speech, specifically through political contributions. *Colo. Educ. Ass'n v. Rutt*, 184 P.3d 65, 76 (Colo. 2008). "Just as restrictions on expenditures impinge upon political expression, they also restrain political association, which is equally protected by the First Amendment. Restrictions on contributions and expenditures by labor organizations implicate this right because they impose burdens on individuals acting together to amplify their speech." *Id.* (citing *Buckley*, 424 U.S. at 15, 96 S.Ct. 612). Thus, the issue here is whether Amendment 54 violates the First Amendment by restricting all contributions from labor organizations and their political committees. To answer this question, we follow the Supreme Court's precedent and subject the law to "the closest scrutiny," requiring the State demonstrate "a sufficiently important interest and employ[ ] means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25, 96 S.Ct. 612.[35]

In *Buckley*, the Supreme Court considered a First Amendment challenge to a $1,000 campaign contribution limit as part of the Federal Election Campaign Act (FECA).[36] *Buckley*, 424 U.S. at 25, 96 S.Ct. 612. It found three governmental interests justifying the limit, but it relied solely on "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office."[37] *Id.* The Supreme Court recognized this as a sufficiently important government purpose to justify the

limit, reasoning that: (1) the $1,000 limit narrowly targeted problematic large donations while allowing small contributions, and (2) the limit still allowed some speech through volunteering, direct contributions, or the coordinated efforts of PACs. *Id.* at 28–29, 28 n. 31, 96 S.Ct. 612.[38]

Indeed, although the purpose of Amendment 54 and that of FECA are nearly identical, *Buckley* is largely inapplicable here because the three primary justifications underlying the *Buckley* holding are absent. Each of these three reasons taken alone requires us to strike the union references in the Amendment for violating the First Amendment.

First, section 15 of Amendment 54 imposes an absolute bar on any contribution no matter how small, completely silencing the political voice that the *Buckley* Court took pains to protect. Given FECA's goal of targeting the large, potentially corruptive contributions, *Buckley* ruled that allowing small contributions was an essential outlet for expression in the otherwise comprehensive law because it demonstrated a narrowly tailored solution. *See id.* at 28, 96 S.Ct. 612. Without such an outlet here, we cannot find Amendment 54's solution to the pay-to-play problem "closely drawn" under First Amendment analysis.

Second, section 2(4.5) leaves labor organizations involved in collective bargaining with no political voice either through their own direct contributions or through any affiliated PAC. In light of *Buckley*, where the Su-

---

**35.** For clarity's sake, we note that the First Amendment test for contribution limits impinging on associational freedoms, as described in *Buckley* and applied here, differs from the First Amendment test for overbreadth discussed *supra*.

**36.** We again highlight the difference between contribution limits, which flow directly to "any candidate committee, issue committee, political committee, small donor committee, or political party," Colo. Const. art. XXXVIII, § 2(5)(a)(I), and expenditure limits, which may indirectly benefit a party but are not specifically targeted. *See Citizens United*, 130 S.Ct. at 908–09; *Nixon*, 528 U.S. at 387–88, 120 S.Ct. 897.

**37.** The Supreme Court listed two other interests—equalizing the voice of the masses by minimizing the voice of the affluent and setting a

ceiling on general campaign spending—but explicitly stated that it was "unnecessary to look beyond the Act's primary purpose" to these two "ancillary" justifications. *Buckley*, 424 U.S. at 25–26, 96 S.Ct. 612. In fact, *Citizens United* calls these two ancillary justifications into doubt, but they are irrelevant for our analysis here. *See Citizens United*, 130 S.Ct. at 903–08.

**38.** The Supreme Court explicitly recognized that: "The Act places no limit on the number of funds that may be formed through the use of subsidiaries or divisions of corporations, or of local and regional units of a national labor union." *Buckley*, 424 U.S. at 28 n. 31, 96 S.Ct. 612.

preme Court upheld the federal spending limit only after stressing the fact that union PACs still retained a voice, Amendment 54's comprehensive ban on political speech by unions cannot stand.[39] Because there are other, more discrete options to limit corruption without completely stifling speech, we hold that section 2(4.5) is not closely drawn.

Third, the stated purpose of Amendment 54—preventing the appearance of impropriety—cannot exist in negotiating collective bargaining agreements because the government does not and cannot select the union with which it contracts. Indeed, a union cannot contract with the government without first demonstrating, usually through an election, that a majority of the represented employees have chosen the specific union as their representative. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 220–21, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Littleton Educ. Ass'n v. Arapahoe County Sch. Dist., No. 6*, 191 Colo. 411, 416–17, 553 P.2d 793, 796–97 (1976). Once that union has been endorsed, it alone can enter into a public collective bargaining agreement with the State, meaning the State has absolutely no choice over which union to award a contract. *Abood*, 431 U.S. at 220–21, 97 S.Ct. 1782 ("The principle of exclusive union representation ... is a central element in the congressional structuring of industrial relations."); *see also Littleton Educ. Ass'n*, 191 Colo. at 416–17, 553 P.2d at 796–97.

In fact, a negotiated collective bargaining agreement shares few, if any, common characteristics with the standard procurement contract. The State must contract with the one elected union and the benefits from the contract flow through to the employees without benefitting the union in any direct way. The union's power, in turn, is simply a derivative of its represented employees. These attributes make the potential of pay-to-play corruption in a collective bargaining agreement exceedingly remote, so the government lacks a sufficiently important interest to justify this sort of heavy-handed regulation.[40]

---

39. Section 2(4.5) proscribes donations by "the labor organization and any political committees created or controlled by the labor organization." The State argued at trial that this language allows contributions via small donor committees, but the trial court held that a small donor committee is a type of banned political committee. Section 2's definition of small donor committee further confuses the issue, stating both that "small donor committee means any political committee that has accepted contributions only from natural persons who each contributed no more than fifty dollars in the aggregate per year," Colo. Const. art. XXVIII, § 2(14)(a), and that "small donor committee does not include political parties, political committees, issue committees, or candidate committees as otherwise defined in this section," Colo. Const. art. XXVIII, § 2(14)(b). We find it unnecessary to reach this point, however, because the *Buckley* Court premised its holding specifically on the fact that unions could speak through political committees to a "substantial extent ... with financial resources." 424 U.S. at 28 & n. 31, 96 S.Ct. 612 ("Each separate fund may contribute up to $5,000 per candidate per election so long as the fund qualifies as a political committee under [2 U.S.C.] § 608(b)(2).") The possibility of a $50 donation to a small donor committee does not satisfy *Buckley's* requirement as a viable means "to engage in independent political expression." *Id.* at 28, 96 S.Ct. 612. Even if a possible conduit for union speech, small donor committees cannot salvage section 2(4.5) under *Buckley* because the donations are de minimus.

40. We acknowledge the fact that prior campaign contributions by a union could hypothetically result in an overgenerous contract down the line, but Amendment 54 does not target this type of corruption according to its constitutional language, nor does the Blue Book envision this corruption as an argument for passage of the Amendment. Indeed, the Blue Book states in its "Arguments For" section that:

> Amendment 54 furthers the efficient use of taxpayer dollars by promoting competitive bidding for government contracts. It makes contracts where fewer than three bids are solicited less attractive by prohibiting political contributions from entities that receive such contracts. Amendment 54 thus encourages taxpayer value in contracting, and discourages instances where it may be easy to rely on entities with existing contracts.

Moreover, quid pro quo corruption and the appearance of that corruption are minimal because the union representative has been elected by employees, the State has no choice but to negotiate with that specific union, and the union itself cannot directly benefit from the contract. Thus, the State cannot choose the union with which it prefers to contract, so the State simply cannot be corrupted when deciding which union to award a contract—the elected union is the State's only option. For example, if the plaintiff Laurence Botnick were elected to the Denver School Board after receiving contributions from the Denver Classroom Teachers Association (DCTA), he could be, assuming Denver teachers

Hence, because Amendment 54's prohibitions do not serve a sufficiently important government interest in this case, we find its organized labor provisions, specifically subsections 2(4.5) and 2(14.4), violate the First Amendment.

### 2. The Fourteenth Amendment

■ Amendment 54 prohibits contributions by a "labor organization and any political committees created or controlled by the labor organization," but it does not restrict contributions by PACs affiliated with any other type of donor, such as private corporations. Colo. Const. art XXVIII, § 2(4.5). By prohibiting both unions and their PACs from making contributions, Amendment 54 completely strips unions of any political voice, while still allowing corporations to participate through their own PACs.[41] *See Rutt,* 184 P.3d at 75 ("Campaign spending is a form of speech, because 'virtually every means of communicating ideas in today's mass society requires the expenditure of money.'" (quoting *Buckley,* 424 U.S. at 19, 96 S.Ct. 612)). Thus, Amendment 54 treats labor organizations differently than other entities, implicating the freedoms guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

■ Our threshold inquiry in an equal protection claim is whether the law produces "dissimilar treatment of similarly situated individuals." *Indus. Claim Appeals Office v. Romero,* 912 P.2d 62, 66 (Colo.1996); *Harris v. Ark,* 810 P.2d 226, 229 (Colo.1991) ("Equal protection of the laws guarantees that per-

sons who are similarly situated will receive like treatment by the law."). The State contends that, due to manifest structural differences between private corporations and labor unions, the two groups are not similarly situated, meaning the law need not treat them equally.

■ We find, however, that the proper inquiry does not end by merely acknowledging obvious superficial differences between persons or groups, but instead focuses on whether "reasonable differences" between the two can justify a law's differential treatment. *Bushnell v. Sapp,* 571 P.2d 1100, 1105, 194 Colo. 273, 281 (1977); *see also Romero,* 912 P.2d at 66–67. In other words, the "similarly situated" inquiry turns not on whether two entities are superficially alike, but on whether the two are situated or positioned similarly, thereby allowing one law to affect them differently.[42] If the definition of similarly situated were not tethered to how persons are affected by the law, any law that could demonstrate a facial difference between two groups would escape scrutiny and pass constitutional muster, completely eviscerating the Equal Protection Clause.

■ Although unions and corporations are structurally dissimilar, both are similarly situated under Amendment 54's auspices. Therefore, we proceed to determine what level of scrutiny the Equal Protection Clause demands. "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dept. v. Mos-*

---

elected the DCTA to represent them each of the following years, responsible, along with other Board members, for negotiating contracts with the DCTA. He could not, however, choose that union in the future to repay a political debt, nor could he unilaterally shape the contract, nor could the union itself directly benefit from the contract.

**41.** We recognize that a PAC "does not allow a corporation to speak," *Citizens United,* 130 S.Ct. at 897, but PACs affiliated with corporations or unions maintain a voice in the political discussion that can undeniably express or promote the parent corporation's or union's interests. *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 493–94, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Thus, the fact that a corporation can advocate its views through a

PAC under Amendment 54 while a union cannot represents disparate treatment under the Fourteenth Amendment.

**42.** For example, the Supreme Court in *Tuan Anh Nguyen v. Immigration & Naturalization Service* held that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood" because a mother's parenthood is obvious as she births a child while a father's is not. 533 U.S. 53, 63, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001). The Supreme Court reached this conclusion not based on the obvious superficial differences between a man and woman, but because assessing a mother's and a father's status as a biological parent under the law is quite different, meriting differential treatment. *Id.*

*ley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (citing *Williams v. Rhodes,* 393 U.S. 23, 69, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)); *see also Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.").

While we acknowledge that the stated purpose of Amendment 54 is legitimate in other contexts, that governmental interest fails to justify the disparate treatment of labor unions and other types of sole source contractors. Unions present little threat of pay-to-play corruption because employees volitionally elect to be (or not to be) represented by a specific union prior to negotiating a new collective bargaining agreement, and in turn, the state must negotiate with that union regardless of its preferences. *See Abood,* 431 U.S. at 220–21, 97 S.Ct. 1782. Certainly the threat of impropriety inherent in this process is insufficient to merit additional prohibitions on organized labor's speech, especially when other private entities are better structured to engage in illicit pay-to-play contracting.

The State also argues that there is a heightened governmental interest in protecting state employees from any appearance of corruption. *See, e.g., Ysursa,* 129 S.Ct. at 1098–99. But this rationale is entirely distinct from Amendment 54's stated purpose of preventing corruption in contracting. Thus, because there is no compelling governmental interest underlying the disparate treatment of different sole source contractors in this case, we hold that Amendment 54's provisions applying to labor organizations also violate the Fourteenth Amendment's Equal Protection Clause.

### VI. The Prohibition against Contributing to Ballot Issues

Section 17(2) prevents "any person" who contributes to a ballot issue from entering into a sole source contract "related" to that issue. This provision contains no temporal limitation. Sections 17(3) and 17(4) provide the penalties for violating the ballot issue provision. Those sections were discussed previously in this opinion.

■ The Supreme Court has held that limits on contributions to ballot measures implicate First Amendment freedoms and are therefore subject to exacting scrutiny. *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). The *Bellotti* Court distinguished candidate elections from votes on ballot issues. *Id.* at 790, 98 S.Ct. 1407. "The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Id.* (internal citations omitted). The Court noted that the purpose of contributing to a ballot issue is to influence the outcome of the vote, "[b]ut the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Id.* Consequently, contribution limits to ballot issues are subject to a high standard of scrutiny—the government must show a "compelling" interest, and "the State must employ means closely drawn to avoid unnecessary abridgement." [43] *Id.*

The ballot issue provision of Amendment 54 is similar to a restriction that the Tenth Circuit previously held unconstitutional. *See Elam Const., Inc. v. Reg'l Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir.1997). In *Elam,* the Regional Transportation District adopted a resolution that it would not contract with any party that had contributed more than $100 to a tax rate increase ballot measure. *Id.* at 1344. A construction company challenged the resolution, claiming that the resolution violated its First Amendment rights. *Id.* at 1344–45. The Tenth Circuit agreed, citing *Bellotti's* distinction between candidate elections and votes on public issues. *Id.* at 1347.

■ We adopt the approach of *Bellotti* and *Elam* here. In this case, concerns about

---

**43.** Although contributions to ballot issues are arguably similar to independent expenditures, the Supreme Court did not address this type of prohibition in *Citizens United.* Therefore, that decision does not affect our analysis.

quid pro quo arrangements are not sufficient to justify Amendment 54's stringent restrictions. The government's interest in eliminating the appearance of impropriety is not sufficiently "compelling" with respect to ballot issues. A contribution to a ballot issue is not a contribution to an individual political candidate; the appearance of impropriety, accomplished through a quid pro quo arrangement, is divorced from the contribution itself. Instead, a contribution to a ballot issue is a show of support for that specific issue, which is then left to the voters to decide. If the measure passes, the controlling government authority must award the contract. The government official with discretion to award the contract has not received any personal benefit from a contribution to the ballot issue; thus, contributing to a ballot issue does not give the appearance of a standard quid pro quo arrangement.[44] Because there is an insufficient link between a ballot issue contribution and the contract award, we hold that the State's interest is not sufficiently compelling under *Bellotti*.

Amicus Clean Government Colorado urges us to adopt a narrow reading of this restriction. It argues that, because section 17(2) prohibits "any person" from entering into a sole source contract after contributing to the ballot issue, only the contributing entity itself falls under the prohibition. With respect to unions, Clean Government Colorado argues that only the union itself is prohibited from contributing to ballot issues that would affect its collective bargaining agreement. Therefore, a union's PACs or small donor committees can contribute to a ballot issue without running afoul of section 17(2). Without deciding what entities would be covered under 17(2)'s "any person" language, we hold that the State's interest is not sufficiently compelling. Any reading of this section would be an unconstitutional prohibition under the First Amendment.

## VII. An Overview of Amendment 54's Constitutionality

In sum, we have found broad sections of Amendment 54 unconstitutional. Before delving into a remedy, we believe it helpful to reproduce Amendment 54 here. We strike out all language that we have found to violate the Constitution and all references to those unconstitutional sections.[45] After the necessary redactions, the remaining sections of the Amendment would read as follows.

**Section 15:** Because of a presumption of impropriety between contributions to any campaign and sole source government contracts, contract holders shall contractually agree, for the duration of the ~~contract and for two years thereafter,~~ to cease making, ~~causing to be made, or inducing by any means,~~ a contribution, ~~directly or indirectly, on behalf of the contract holder or on behalf of his or her immediate family member and for the benefit of any political party or for the benefit of any candidate for any elected office of the state or any of its political subdivisions.~~

**Section 16:** To aid in enforcement of this measure concerning sole source contracts, the executive director of the department of personnel shall promptly publish and maintain a summary of each ~~sole source government contract~~ issued. Any contract holder of a ~~sole source government~~ contract shall promptly prepare and deliver to the executive director of the department of personnel a true and correct "Government Contract Summary," in digital format as prescribed by that office, which shall identify the names and addresses of the contract holders and all other parties to the government contract, briefly describe the nature of the contract and goods or services performed, disclose the start and end date of the contract, disclose the contract's

---

44. We recognize that in some instances there is a danger of quid pro quo or pay-to-play arrangements in contract awards under ballot issues. Our holding, however, is that the appearance of impropriety in the contribution to a ballot issue is not compelling enough to support Amendment 54's restriction on subsequent sole source contracts. *See Citizens United*, 130 S.Ct. at 908 (recognizing the acceptable regulation of the ap-

pearance of impropriety in contribution limits while holding that limits on independent expenditures have a chilling effect on free speech).

45. An example of a similar approach can be found in *Citizens for Responsible Government State Political Action Committee v. Davidson*, 236 F.3d 1174, 1194–96 (10th Cir.2000).

estimated amount or rate of payment, disclose the sources of payment, and disclose other information as determined by the executive director of the department of personnel which is not in violation of federal law, trade secrets or intellectual property rights. The executive director of the department of personnel is hereby given authority to promulgate rules to facilitate this section.

**Section 17:** (1) Every sole source government contract by the state or any of its political subdivisions shall incorporate article XXVIII, section 15, into the contract. Any person who intentionally accepts contributions on behalf of a candidate committee, political committee, small donor committee, political party, or other entity, in violation of section 15 has engaged in corrupt misconduct and shall pay restitution to the general treasury of the contracting governmental entity to compensate the governmental entity for all costs and expenses associated with the breach, including costs and losses involved in securing a new contract if that becomes necessary. If a person responsible for the bookkeeping of an entity that has a sole source contract with a governmental entity, or if a person acting on behalf of the governmental entity, obtains knowledge of a contribution made or accepted in violation of section 15, and that person intentionally fails to notify the secretary of state or appropriate government officer about the violation in writing within ten business days of learning of such contribution, then that person may be contractually liable in an amount up to the above restitution.

(2) Any person who makes or causes to be made any contribution intended to promote or influence the result of an election on a ballot issue shall not be qualified to enter into a sole source government contract relating to that particular ballot issue.

(3) The parties shall agree that if a contract holder intentionally violates section 15 or section 17(2), as contractual damages that contract holder shall be ineligible to hold any sole source government contract, or public employment with the state or any of its political subdivisions, for three years. The governor may temporarily suspend any remedy under this section during a declared state of emergency.

(4) Knowing violation of section 15 or section 17(2) by an elected or appointed official is grounds for removal from office and disqualification to hold any office of honor, trust or profit in the state, and shall constitute misconduct or malfeasance.

(5) A registered voter of the state may enforce section 15 or section 17(2) by filing a complaint for injunctive or declaratory relief or for civil damages and remedies, if appropriate, in the district court.

**Section 2:** (4.5) "Contract holder" means any nongovernmental party to a sole source government contract, including persons that control ten percent or more shares or interest in that party; or that party's officers, directors or trustees; or, in the case of collective bargaining agreements, the labor organization and any political committees created or controlled by the labor organization;

(8.5) "Immediate family member" means any spouse, child, spouse's child, son-in-law, daughter-in-law, parent, sibling, grandparent, grandchild, stepbrother, stepsister, stepparent, parent-in-law, brother-in-law, sister-in-law, aunt, niece, nephew, guardian, or domestic partner;

(14.4) "Sole source government contract" means any government contract that does not use a public and competitive bidding process soliciting at least three bids prior to awarding the contract. This provision applies only to government contracts awarded by the state or any of its political subdivisions for amounts greater than one hundred thousand dollars indexed for inflation per the United States bureau of labor statistics consumer price index for Denver–Boulder–Greeley after the year 2012, adjusted every four years, beginning January 1, 2012, to the nearest lowest twenty five dollars. This amount is cumulative and includes all sole source government contracts with any and all governmental entities involving the contract holder during a calendar year. A sole source government contract includes collective bargaining agreements with a labor organization

~~representing employees, but not employment contracts with individual employees. Collective bargaining agreements qualify as sole-source government contracts if the contract confers an exclusive representative status to bind all employees to accept the terms and conditions of the contract;~~ (14.6) ~~"State or any of its political subdivisions" means the state of Colorado and its agencies or departments, as well as the political subdivisions within this state including counties, municipalities, school districts, special districts, and any public or quasi-public body that receives a majority of its funding from the taxpayers of the state of Colorado.~~

## VIII. Remedy

Given that we have found large portions of Amendment 54 unconstitutional, we are left with the question of whether any portion of it can remain. In addressing a flawed amendment, we ask whether we can functionally preserve the amendment's intent after excising the problematic sections. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) ("[T]he statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements."); *People v. Montour*, 157 P.3d 489, 501–02 (Colo.2007); *City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 70 (Colo.1981). After striking all unconstitutional sections, we find it impossible to achieve Amendment 54's legitimate purpose without substantially rewriting the Amendment from the bench; therefore, we find the entire Amendment unconstitutional.

### A. The Severability Doctrine

Our severability framework includes both state and federal jurisprudence, but both strands follow the same broad principles of judicial restraint mixed with resolute protection of the lawmaker's intent. "[T]he touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (quoting *Califano v. Westcott*, 443 U.S. 76, 94, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (Powell, J., concurring in part and dissenting in part)). For the purposes of this analysis, we find the intent of the people as expressed through the exercise of direct democracy comparable and equal to that of the legislature. Hence, the voters' stated purpose in section 15 guides our remedy.

To address deficient laws, we adhere to three specific rules. First, we cannot rewrite or actively reshape a law in order to maintain its constitutionality. *Ayotte*, 546 U.S. at 329, 126 S.Ct. 961. While we prefer a remedy that maintains the vitality and purpose of the law if possible, we will not pursue those aims with a myopic vigor that ignores the law before us. The law in question must be "readily susceptible" to a limiting construction because we decline to transgress the boundaries of the judiciary by drawing arbitrary and unsubstantiated parameters. *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 397, 108 S.Ct. 636. Drafting a law remains the role of the legislature or, in this case, the people of this state. We acknowledge and embrace our responsibility to redress problematic sections by striking entire laws for a single fault, but not at the expense of a "serious invasion of the legislative domain." *Ayotte*, 546 U.S. at 329, 126 S.Ct. 961 (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n. 26, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995)). Hence, we will look to fix the law but will not rewrite the law.

Second, we strike as little of the law as possible, with a preference for only partial, not complete, invalidation. *Ayotte*, 546 U.S. at 329, 126 S.Ct. 961. "Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portions remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body." *City of Lakewood*, 634 P.2d at 70. In so doing, we must take into account any severability clause, which demonstrates the lawmaking body's intent that the law remain largely in force despite particular, limited infirmities. *Id.; Champlin Ref. Co. v. Corp. Comm'n*, 286 U.S. 210, 235,

52 S.Ct. 559, 76 L.Ed. 1062 (1932); *Montour*, 157 P.3d at 502. A severability clause raises a presumption that parts of a law can and should be struck without upsetting the law's proper purpose. *City of Lakewood*, 634 P.2d at 70. Thus, a severability clause answers the second, intent factor of the *City of Lakewood* framework, leaving only the question of whether an autonomous and functional law remains after removing the flawed portions.

■ That analysis naturally leads to the third rule—the presumption in favor of severing only specific parts of a law "is dispelled if what remains is so incomplete or riddled with omissions that it cannot be 'salvag[ed] ... as a meaningful legislative enactment.'" *Id.* (quoting *Pierce v. City & County of Denver*, 193 Colo. 347, 352, 565 P.2d 1337, 1340 (1977)); *Montour*, 157 P.3d at 502. In other words, we strike the entire law if its purpose is so eviscerated by necessary nullifications that the original law cannot stand in any working order. *See, e.g., City of Lakewood*, 634 P.2d at 56, 70 (striking an entire section of city's zoning code because "its deficiencies were so pervasive that it could not be salvaged as a meaningful legislative enactment"); *Pierce*, 193 Colo. at 352, 565 P.2d at 1340 ("While the [obscenity] ordinance in question contains a 'severability' clause ... the pervasive character of its deficiencies renders futile any attempt to salvage it as a meaningful legislative enactment.").

## B. Addressing Amendment 54's Deficiencies

■ Many aspects of Amendment 54 are unconstitutional for the reasons stated above, and we must address each of these problems individually to form our remedy today. For that reason, we proceed through the Amendment, applying the aforementioned rules before reaching a conclusion regarding whether each is salvageable or entirely unconstitutional.[46]

Section 15 has three significant problems—vagueness, disproportionality, and overbreadth.[47] Colo. Const. art. XXVIII, § 15. The language "causing to be made[ ] or inducing by any means ... directly or indirectly" is void for vagueness. The "two years thereafter" clause sets a disproportionate punishment. Finally, the family provision and the application clauses including "any political party," "any elected office," and "any of its political subdivisions" are overbroad.

We are disinclined to rewrite the vague language because Amendment 54's goal—curbing the appearance of impropriety in government contracts—offers us no guidance on how to limit such language. Similarly, we cannot simply change the two years penalty, nor can we salvage the overbroad sections by wholesale rewriting who and what the Amendment targets. As the Supreme Court observed, some laws or sections are simply too broad to be "readily susceptible" to a limiting construction. *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 397, 108 S.Ct. 636. Moreover, we cannot sever the defects because Amendment 54's purpose would be lost without any language outlining the scope of its applicability. Given that the necessary nullifications would leave section 15 completely eviscerated, we are left with no choice but to sever all of section 15. *City of Lakewood*, 634 P.2d at 70.

We now turn to section 17, which has multiple subsections. Colo. Const. art. XXVIII, § 17. Section 17(1) begins by incorporating section 15, which we have excised in its entirety, so we must strike the first sentence and all subsequent references to section 15. Striking section 15 then renders the rest of section 17(1) meaningless because the remaining language attempts to prescribe a penalty without any corollary offense.

Section 17(2), which deals with ballot issues, is entirely unconstitutional because it is not closely drawn to a compelling govern-

---

**46.** We note that we have already found the majority of section 16 constitutional. While we remove references to sole source government contracts for overbreadth, the Government Contract Summary and its disclosure requirements for all government contract holders are constitutional in and of themselves. Therefore, we ad- dress section 16 in relation to the Amendment as a whole later in Part VIII.C.

We also note that section 13 titled "Applicability and Effective Date" is no longer pertinent.

**47.** *See supra* Parts III & IV.

ment interest.[48] Similarly, sections 17(3) and 17(4) impose unconstitutionally severe penalties for contract holders and government officials, leaving us no option but to entirely excise each as well.[49]

Finally, we find no problem with section 17(5)'s citizen standing provision, so it could remain. Section 17(5), however, no longer represents any sort of "meaningful legislative enactment." *City of Lakewood,* 634 P.2d at 70. Thus, we must sever all of section 17. *Id.*

Focusing next on Amendment 54's definitions, we have found most of section 2 unconstitutionally overbroad. Colo. Const. art. XXVIII, § 2. Both section 2(8.5) (defining "immediate family members") and section 2(14.6) (defining "state or any of its political subdivisions") overbroadly apply the Amendment to families and government.[50] Section 2(4.5) (defining "contract holder") legitimately includes ten-percent shareholders, officers, directors, and trustees, but we must strike as unconstitutional its application to organized labor.[51] Lastly, section 2(14.4) (defining "sole source government contract") includes the phrases "any government contract" and "the state and any of its political subdivisions," which are overbroad as written.[52] Also, its application to collective bargaining agreements is improperly tailored.[53] The breadth and tailoring problems leave subsection 14.4 with valid time and financial restrictions but no cognizable application.

Amendment 54's purpose provides us with no standard by which to rewrite these definitions. *See City of Lakewood,* 634 P.2d at 70. We are in no position to arbitrarily decide to whom and to what types of government contracts Amendment 54 should apply—that is the role of the lawmaking body, the people in this case. Therefore, we must sever all of Amendment 54's additions to section 2 as well.

## C. Amendment 54 Cannot Achieve Its Purpose

Because broad portions of Amendment 54 cannot remain in law and cannot be salvaged, we now ask whether the Amendment, taken as a whole, can serve as a "meaningful legislative enactment." *Id.; Montour,* 157 P.3d at 502; *Pierce,* 193 Colo. at 352, 565 P.2d at 1340. We find the deficiencies so pervasive as to render it wholly unconstitutional. After our obligatory striking of sections 15 and 17 and subsections 2(4.5), 2(8.5), 2(14.4), and 2(14.6), section 16's Government Contract Summary is the only portion that retains any substance. But section 16 is dependent on Amendment 54's definition of "sole source government contract," which we have already held is unconstitutionally overbroad. Furthermore, standing alone section 16 cannot effectuate the purpose behind the passage of Amendment 54, and our goal in this situation must be to give effect to the law's overall intent, not specific sections. *See City of Lakewood,* 634 P.2d at 70.

In conclusion, despite the constitutionality of some limited phrases and portions, we hold Amendment 54 "so incomplete or riddled with omissions that it cannot be 'salvag[ed] . . . as a meaningful legislative enactment.'" *Id.* (quoting *Pierce,* 193 Colo. at 352, 565 P.2d at 1340). Therefore, we affirm the trial court's preliminary injunction and remand for a final ruling consistent with this opinion.

Justice MARTINEZ dissents.

Justice COATS does not participate.

Justice EID does not participate.

Justice MARTINEZ, dissenting.

I agree with the majority, although on a somewhat different basis, that the prohibition of all contributions from sole source government contractors in section 15 of Amendment 54 is overbroad because it extends to any elected official of any political subdivision of

---

48. *See supra* Part VI.

49. *See supra* Part III.

50. *See supra* Part III.

51. *See supra* Part V.

52. *See supra* Part III.

53. *See supra* Part V.

the state. *See* maj. op. at 628. I also agree that the union PAC prohibition of section 2(4.5) violates the equal protection clause. *See* maj. op. at 635. However, analyzing the Amendment as a whole and in light of its stated purpose, those provisions that are constitutionally offensive can be severed from the rest of the Amendment, leaving behind a meaningful enactment, albeit reduced in scope. *Cf. City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70–71 (Colo. 1981) (discussing severability doctrine). The majority, on the other hand, fragments its analysis and weighs a number of the provisions against a far narrower purpose than preventing the appearance of impropriety. In doing so, the majority confusingly appears to hold nearly every provision invalid on independent constitutional grounds, while declaring in a footnote that it is only the Amendment as a whole that is unconstitutional, thus severely hindering any future attempt to address the appearance of impropriety in campaign contributions. Therefore, I respectfully dissent from the judgment of the majority nullifying Amendment 54 in its entirety.

Amendment 54 suffers from two critical constitutional deficiencies. The first involves the overbreadth of section 15, which states that sole source contractors may not make contributions for the "benefit of any political party or for the benefit of any candidate for any elected office of the state *or any of its political subdivisions.*" (Emphasis added). This provision of Amendment 54 is overbroad if it "restricts a substantial amount of protected expression"—political contributions— in relation to its "plainly legitimate sweep"— preventing the appearance of impropriety in awarding no-bid government contracts. *See Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003). A cross-jurisdictional ban of the scope suggested by the language of Amendment 54, although certainly tailored to rooting out appearances of impropriety, is simply too fervent in its pursuit of that objective. By extending to contributions to any elected official of any political subdivision, section 15 unconstitutionally restricts a substantial amount of protected expression in relation to its legitimate sweep. *See id.*

However, I disagree with the majority that, in order to avoid overbreadth, the Amendment's prohibitions must be tailored to only those government officials who have some control over awarding no-bid contracts. *See* maj. op. at 627. Limiting the scope in such an overly-narrow manner ignores the issue of appearances altogether and focuses only on actual impropriety. Instead, by simply striking the language, "or any of its political subdivisions," the scope of section 15 is narrowed to apply only to contributions made to political parties and candidates for elected offices of the state. Severing the language in this manner resolves the overbreadth and addresses the stated purpose of Amendment 54, which is to prevent both actual and apparent impropriety. Although this is far narrower in operation than what the sponsors' of the Amendment had in mind, such a narrowing prevents a total invalidation of section 15, the heart of Amendment 54.

The second critical deficiency of Amendment 54 pertains to the definition of "contract holder" in section 2(4.5). This definition is essential to understanding the scope of the Amendment because the Amendment's contribution ban only applies to those defined therein as "contract holders." The definition reads, in pertinent part, "contract holder means . . . in the case of collective bargaining agreements, the labor organization *and any political committees created or controlled by the labor organization.*" (Emphasis added). The Amendment does not restrict contributions by PACs created or controlled by any other type of donor; therefore, the definition raises an issue of equal protection, which prohibits treating similarly situated individuals differently without demonstrating a sufficiently important reason for doing so. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Because Amendment 54's disparate treatment of unions implicates a fundamental right—free speech—that reason must be compelling and the law narrowly tailored. *See id.* ("[Strict scrutiny] by the courts is due when state laws impinge on personal rights protected by the Constitution."). I agree with the majority that the stated pur-

pose of Amendment 54, to prevent the appearance of impropriety, fails to adequately justify the disparate treatment of labor unions and other types of sole source contractors. *See* maj. op. at 635. However, severing the language "and any political committees created or controlled by the labor organization" resolves the equal protection problem while managing to preserve the essence of the definition of contract holder.

Thus, both of the critical constitutional deficiencies of Amendment 54 can be resolved by striking a small amount of language from sections 15 and 2(4.5). Such a severance does not involve rewriting or actively reshaping Amendment 54, *see Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006), and the remaining provisions would function as a meaningful enactment, *see City of Lakewood,* 634 P.2d at 70.

Failing to use severance to address the critical constitutional deficiencies, the majority instead marches through the Amendment striking provisions on seemingly independent grounds, despite its assurances otherwise, allowing the overbreadth of section 15 to infect its analysis. Thus, it refuses to recognize that removing the cross-jurisdictional ban in section 15 would simultaneously reduce the scope of a number of other provisions that the majority concludes to be overbroad.

Not only does the majority appear to fragment its analysis by analyzing each provision individually, but it also places many of the provisions at an analytical disadvantage in terms of overbreadth by effectively weighing them in light of the narrower purpose of preventing *actual* impropriety, rather than the stated purpose of Amendment 54, the broader purpose of preventing the *appearance* of impropriety. Although the majority seems to acknowledge that preventing the appearance of impropriety is a sufficiently important interest to justify some limits on campaign contributions, *see* maj. op. at 623, there is a strong undercurrent running through the majority's analysis of the Amendment's provisions to indicate that, in fact, the majority is simply dissatisfied with the sufficiency of that interest.

The majority's overbreadth analysis is replete with instances where the majority limits its conception of Amendment 54's stated purpose in order to cast as hopelessly overbroad many of the Amendment's provisions. This is apparent in the majority's analysis regarding section 15's "any government contract" language. *See* maj. op. at 627–28. The majority concludes that the language is overbroad after interpreting it as applying to all government contracts that do not receive three bids. *See* maj. op. at 626–27 n. 26, 627. Such a conclusion, however, is based on a lack of understanding of Amendment 54's most basic function—to promote competitive bidding in the award of all government contracts. The Blue Book states that Amendment 54 "makes contracts where fewer than three bids are solicited less attractive by prohibiting political contributions from entities who receive such contracts." Thus, Amendment 54 incentivizes competitive bidding of all government contracts by allowing for contracts that are not currently competitively bid to avoid the Amendment's prohibitions if the government awards such contracts only after first soliciting three bids. In order to avoid sole source contract status and thus remove a contract from the purview of Amendment 54, the government would be required to solicit at least three bids for some contracts that are already competitively bid. However, those contracts are only incidental to the target of Amendment 54—contracts currently being awarded without any competitive bidding. Although soliciting at least three bids may not result in the actual receipt of three bids, by inviting three bids it creates the opportunity for competition, which serves the Amendment's purpose of preventing the appearance of impropriety.

Similarly, the majority's conclusion that there are contracts that simply cannot be competitively bid, *see* maj. op. at 626–27, also misses the point of addressing appearances.[1]

---

1. Moreover, the majority's conclusion that a "substantial number" of sole source contracts cannot or should not be competitively bid, *see* maj. op. at 627, is not supported in the record, and I would be hesitant to conclude that Amendment 54 covers a "substantial number" of these

Even the government's initial decision about whether there is a need for a particular service or product leaves room for elected officials to exercise discretion and thus room for the appearance of impropriety. Requiring the solicitation of three bids reduces the appearance of such discretion and impropriety, even if it does not actually prevent it. Thus, whether this particular provision is overbroad appears to be a far closer question when one considers it in light of the real purpose of Amendment 54, which is to prevent the appearance of impropriety, not just actual impropriety.

Another instance where the majority takes an unnecessarily narrow view of Amendment 54's purpose is in its discussion of the overbreadth of the penalty provisions. *See* maj. op. at 628–29. Although I agree with the majority that some of the penalties are harsh, I do not agree that this fact alone is enough to render them disproportional. Notwithstanding that reducing the scope of section 15 would also limit the kinds of contributions subject to penalty, each penalty appears to be specifically calibrated in a manner that correlates with the type of offender and the purpose of the Amendment in addressing appearances of impropriety. Elected and appointed officials, because they directly represent the government, are given the harshest penalties for knowingly violating the Amendment. Similarly, because government contractors work on behalf of the government, they likewise present the problem of appearance of impropriety and are also penalized, albeit not as harshly as elected officials. Moreover, it is important to note that Amendment 54 only proscribes *knowing* or *intentional* violations.[2] Were that not the

case, and instead a mere accidental violation was sufficient to trigger the penalties, I would agree with the majority that these penalties would be disproportionately harsh. However, as they stand, the penalties fall within the legitimate sweep of the Amendment.

The majority's analysis of these penalty provisions highlights how, throughout the overbreadth analysis, the majority acknowledges but then appears to pay little attention to the fact that Amendment 54 requires knowledge or intent. Another example of this is in the majority's analysis of the provision relating to immediate family members. The majority properly interprets the language to apply only to those instances where a contract holder attempts to circumvent the Amendment by making an illegal contribution in the name of a family member. *See* maj. op. at 630. Nevertheless, the majority's analysis then assumes that family members' unfounded concerns about accidentally violating the Amendment will make them "likely to refrain from contributing altogether," thus stifling a substantial amount of protected speech. *See* maj. op. 630. I fail to see why we should take into account an irrational fear of accidental violations when Amendment 54 clearly requires intent. Conversely, because the purpose of the Amendment is to deter knowing violations, the degree to which the Amendment stifles political speech in the form of a contribution knowingly made in violation of the Amendment falls entirely within the stated purpose of Amendment 54.

The majority's insensitivity to the Amendment's stated purpose is evident in other

---

contracts without more than just the plaintiffs' unsupported contentions and a vague reference in the Blue Book analysis of the Amendment.

**2.** The majority acknowledges that section 17's requirement that the violation be knowing or intentional lessens the scope of the Amendment's penalties, but then it relies on its holding that section 15's language defining the underlying liability is impermissibly vague to likewise hold that the penalties are vague. *See* maj. op. at 629 n. 31. In analyzing section 15 for vagueness, however, the majority merely concludes that it is vague without actually explaining how. I do not see section 15 as vague. When its language is read in conjunction with the knowing or inten-

tional requirement, the basis of liability is quite clear to a person of ordinary intelligence—a contract holder is liable for "knowingly inducing" or "knowingly causing," directly or indirectly, a contribution on behalf of himself or his immediate family members. There is nothing vague about "knowingly inducing" or "knowingly causing" a contribution. Although the intent of an actor is sometimes proven by circumstantial evidence, such is the case with all crimes that require a showing of intent and does not render section 15 vague. *See, e.g., People v. Czemerynski*, 786 P.2d 1100, 1112 (Colo.1990) (recognizing that statutes requiring intent are not likely to be invalidated because of vagueness).

places as well. For instance, during its discussion of Amendment 54 in the context of unions, the majority holds that corruption is "exceedingly remote," and thus, the government lacks a sufficiently important interest to justify Amendment 54's "heavy-handed regulation." Maj. op. at 633. Even if it were true that actual corruption never exists between political contributions and unions, the majority fails to consider the provision in light of the purpose of preventing the appearance of impropriety. It is not difficult to perceive impropriety in the case where on one side of the bargaining table sits an elected official, and on the other side of the table sits a union that contributed money to the official's campaign for election.[3] Notwithstanding the fact that the elected official cannot "choose that union" in the future to repay a political debt, maj. op. at 633–34 n. 40, and regardless of whether the "union itself" directly benefits, id., that elected official still has discretion over the specific terms of the contract, which could translate to a direct benefit to the union members, thus giving rise to actual or apparent impropriety.

Similarly, the majority concludes that "eliminating the appearance of impropriety is not sufficiently 'compelling' with respect to ballot issues." Maj. op. at 636. Section 17(2) prohibits the government from awarding a no-bid contract to a person who has contributed money to a ballot issue relating to that contract. Interpreting the words "relating to" in light of Amendment 54 as a whole and in light of its stated purpose, it is "fairly possible" to read this provision as only prohibiting the award of contracts that "directly arise" from a ballot issue to a donor that contributed money to that particular ballot issue. See Branson Sch. Dist. RE–82 v. Romer, 161 F.3d 619, 636 (10th Cir.1998) (citing Commc'ns Workers v. Beck, 487 U.S. 735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988)). This prohibition would only apply to ballot issues that directly give rise to a noncompetitively bid contract. For instance, if a construction firm contributed money to the passage of a ballot issue authorizing a mill levy increase to fund a new construction project, the government could not award a no-bid contract for that new project to that particular construction firm. If, however, the contract is either competitively bid before being awarded or the contract does not directly arise from the ballot issue, then Amendment 54's prohibition would not apply. Thus, contrary to the majority's holding, see maj. op. at 636, there is a direct link between preventing actual or apparent impropriety and prohibiting the award of a no-bid contract that directly arises from a ballot issue to a donor who contributed money to that ballot issue.

Because the majority relies on an unnecessarily narrow conception of the Amendment's purpose and fragments its analysis of Amendment 54 by examining and striking provisions individually, the majority's analysis provides very little guidance to those who would seek to construct a constitutional proposal addressing the appearance of impropriety related to sole source government contracts. Furthermore, in my view, although I agree with the majority that Amendment 54 suffers from some constitutional deficiencies, I do not agree they are so pervasive that the Amendment cannot be salvaged as a meaningful enactment. See City of Lakewood, 634 P.2d at 56, 70. If the problematic language were to be severed, it would be "fairly possible" to interpret the remaining provisions in a manner that renders the entire Amendment constitutionally valid. Branson Sch. Dist., 161 F.3d at 636 (citing Commc'ns Workers, 487 U.S. at 762, 108 S.Ct. 2641).

Whatever my misgivings are about the policy underlying Amendment 54, the people of

**3.** The State notes that this very problem could have occurred had Plaintiff Botnick won his election for a seat on the Denver School Board in 2007. The Denver Classroom Teachers Association, which had a collective bargaining agreement with Denver schools, endorsed him as a candidate and contributed $5000 to his campaign. Had Botnick won, he would have been negotiating on behalf of the Denver School Board with one of his supporters, DCTA. Although Botnick may not have had complete control over the negotiations with DCTA, his position as one of the negotiators could certainly give the appearance that perhaps Botnick would not have had only the Denver School Board's best interests in mind when it came to drafting the terms of the agreement.

Colorado approved such a policy when they voted to adopt the Amendment, and it is our role to give it effect wherever possible. *See Evans v. Romer,* 854 P.2d 1270, 1274 n. 6 (Colo.1993) (noting that presumption of constitutionality applies with more force in the context of a constitutional amendment passed by the people). As such, I respectfully dissent.